## W. L. HEMINGWAY *v*. THE STATE.

1. CRIMINAL PROCEDURE. *Continuance. Discretion. Facts merely supposed to exist.*
   It is not such an abuse of judicial discretion as will justify a reversal, even in a felony case, that the court overruled a motion for a continuance, which was not an application for time to produce evidence then known to exist, but the manifest purpose of which was to enter upon a search for testimony which it was only believed would be discovered.

2. SAME. *Continuance refused. Case in judgment.*
   Defendant, who had been state treasurer for fourteen years, was indicted for embezzlement of $315,612.19, which his books showed to be due the state, and which he failed to pay to his successor. He moved for a continuance, alleging in his affidavit that he had paid over all the money there was in the vaults ; that he was greatly surprised at the shortage, which he believed was only apparent, owing entirely to incorrect bookkeeping ; that he had a reliable-expert accountant at work on the books, who had not been able to finish his examination, but who had found many errors and could, by the next term, complete his examination, which would exonerate defendant. An· affidavit of the expert of the same tenor was also filed. This was six months after defendant's term of office expired, but the books had been detained several months after the term for official examination. The motion was denied and defendant was convicted. The° evidence showed that the books were correct and that the alleged errors did not exist. *Held*, that the refusal to grant the continuance was without prejudice.

3. SAME. *When court will review the whole evidence*
   On motion for a new trial or on appeal, the court occupies a vantage ground in reviewing the action of the trial judge in refusing a continuance. From this position, in the light of the developed facts, it will look to the whole case in deciding whether or not the party was prejudiced by the refusal to grant the continuance.

4. CRIMINAL LAW. *Embezzlement. Code 1880, §§ 2787, 2788, 2789. Particular offenses.*
   Sections 2787, 2788 and 2789, code 1880, define specific offenses of fraud and embezzlement. These sections are considered by the court with

reference to the indictment in this case, and it is held that it does not charge an offense under either of them.

5. SAME. *Code* 1880, § 2790. *General provisions.*

Neither of the counts in the indictment charging any of the particular offenses defined in the three preceding sections of the code, all the counts are to be referred to, and may be maintained under § 2790, which is a general law covering all cases of fraud and embezzlement not specially provided for in the other sections.

6. CRIMINAL PROCEDURE. *Motion in arrest. Sufficiency of indictment.*

There being no demurrer and no motion to quash, a motion in arrest of judgment cannot be sustained unless all the counts in the indictment are so fatally defective as actually to charge no offense known to the law. In this case the first and second counts charge embezzlement in the ordinary form, and the third count charges the same but with greater precision and circumstantiality. Therefore a motion in arrest was properly overruled.

7. SAME. *Different counts. Motion to compel state to elect. Waiver.*

A motion to compel the state's counsel to elect under which of the several counts he will proceed is not one of right, being generally addressed to the sound discretion of the court. Such motion comes too late if made after defendant has pleaded to the entire indictment and gone to trial and the state has concluded its testimony. *George* v. *State,* 39 Miss. 570.

8. INSTRUCTION. "*Reasonable doubt of innocence.*" *Error cured.*

An instruction that the defendant should be convicted if the evidence shows no reasonable excuse for his failure to pay over the money alleged to have been embezzled and "raises no reasonable doubt of his *innocence*" is not ground for reversal. This expression, though unusual, means that there could be no conviction if there was reasonable doubt of guilt; but, if misleading, it was cured by other instructions stating explicitly that the defendant must be acquitted unless the evidence established his guilt beyond a reasonable doubt.

9. SAME. *Prima facie case. Instructions. Province of jury. Duty of court.*

In this case instructions announcing that a shortage shown by defendant's books and his failure to pay over make out a *prima facie* case of embezzlement, and that the jury should convict unless all the evidence raises some reasonable doubt of guilt, are unobjectionable. This is not a comment on the weight of evidence, or an invasion of the province of the jury. The evidence is left to them, but with a direction that the defendant should be convicted if the facts are found as stated, and this is proper. It is the duty of the judge to instruct the jury that on a given finding of fact they must follow his conclusions of law.

---

Syllabus.

---

10. INSTRUCTION: WHEN NOT MISLEADING. *Warrants not lawfully drawn. Payment.*

An instruction for the state that the defendant is guilty if he "wilfully and fraudulently disbursed or otherwise made way with the money of the state that came into his hands, save in the payment of warrants lawfully drawn on the treasury," is unobjectionable. It does not mislead so as to authorize a conviction if the default was caused by paying money in good faith on warrants not lawfully drawn.

11. EMBEZZLEMENT. *Shortage. Failure to pay over. Burden to explain.*

In a prosecution for embezzlement against a state treasurer the prosecution is not bound to prove any positive acts of concealment in connection with the public moneys. It is sufficient if the testimony proves that the defendant has made way with the money or gotten rid of it wilfully and fraudulently in any manner not allowed by law. If the jury believe from the evidence that the defendant on settlement is due the state any sum of money received by him as treasurer, which he has not disbursed according to law or paid over to his successor, then it devolves on him to explain what became of it and to give a reasonable excuse for such failure to pay over, and if all the evidence furnishes no reasonable explanation of what became of the money and raises no reasonable doubt of his guilt, the jury should convict.

12. SAME. *Shortage shown by defendant's books. Failure to pay over unexplained. Conviction.*

In such prosecution against a public officer who is required to keep correct accounts, where a balance due the state is shown by his own books, granting the same to have been correctly kept, and granting also that there is nothing in the officer's conduct worthy of reprehension, except the failure to pay over, proof that the books show such balance, together with the failure to pay, unexplained, will alone warrant a conviction.

13. EVIDENCE. *Official records. Presumption of correctness.*

In such prosecution against one who had been state treasurer, an instruction for the state as follows is correct: "The law presumes that the auditor and treasurer each complied with the law in making charges and credits on their books as to receipts and disbursement warrants, and as to furnishing each other with monthly statements of the same, and the law also presumes that their books are correctly kept, and if the incorrectness of the books is relied upon as a defense in this case, it devolves upon the defendant to show such incorrectness, unless the evidence as a whole raises a reasonable doubt that the books are correct."

14. SAME. *Conflicting presumptions. Special prevails.*

In case of conflicting presumptions the special and favored take precedence over the general, and the opposing presumptions must go to the jury, as

in case of conflicting evidence. When the books of account required to be kept by the auditor and the treasurer agree in showing a shortage in the accounts of the latter, who is indicted for embezzlement, the presumption of the correctness of such public records, as against the presumption of defendant's innocence, is sufficient to cast on him the burden of showing errors in the accounts, if he relies upon that as a defense.

15. SAME. *Correctness of defendant's accounts. Presumption.*
On a trial of an officer for embezzlement, to charge him with the receipt of money as shown by his books and reports, it is not necessary for the state to prove beyond a reasonable doubt that he made the entries, or with full knowledge caused them to be made. Being charged by law with the duty of keeping a correct record, if he did not himself make the entries, but relied upon others, to avoid responsibility it devolves upon him to show that the books were incorrect.

16. CRIMINAL PROCEDURE. *Immaterial allegation; need not be proved.*
Though an indictment for embezzlement, which charges an officer with failing to pay over money to his successor, alleges that the money was in his hands when his successor qualified, this allegation is immaterial and need not be proved.

17. SAME. *Instruction invading field of argument; properly refused.*
It is not error to refuse instructions which particularly direct the attention of the jury to the testimony of defendant's previous good character, the absence of flight, the correctness of his books, and the like. These are matters of evidence involving no presumptions of law. Such instructions too nearly invade the field of argument. *Cheatham* v. *State,* 67 Miss. 335.

18. SAME. *Verdict. Improper conduct of counsel. Immaterial errors.*
In cases not clear upon the facts, the improper course of prosecuting counsel in argument which may have influenced the jury in reaching a conclusion, will cause a reversal. But in a case where the evidence is so strong and clear as to be convincing, without reference to immaterial errors of the court or improper conduct of counsel, the court will not disturb a conviction.

FROM the circuit court of the first district of Hinds county.
HON. J. B. CHRISMAN, Judge.

The appellant was tried at the June term, 1890, of the circuit court, and convicted under an indictment charging him with the embezzlement of $315,612.19, received as treasurer of the state of Mississippi. The indictment contains three counts, the substance of each being set out in the opinion of the court. The term of office of the defendant as treasurer ended the first Monday in Jan-

uary, 1890, and it was alleged that he had failed to pay over to his successor all the money in his hands, and that there was a large balance due, which the books in his office then showed to be said sum of $315,612.19.

The defendant made a motion for a continuance based upon his own affidavit and that of one Leroy Douglass, an accountant, the facts in relation to which are stated in the opinion. The continuance was denied, and the defendant excepted.

The defendant had been in office fourteen years consecutively. On the trial the proof on the part of the state consisted mainly of the books in the treasurer's office and the reports and treasury statements made by the defendant from time to time, together with the books of the auditor's office. The treasurer's books showing said balance of $315,612.19, due at the end of defendant's term of office, the state undertook to show had been correctly kept. This fact was testified to by several experts, who were engaged to examine the books. They were also examined by a committee of the legislature, the members of which testified at the trial as to such examination, and that the books had been correctly kept. Much testimony was introduced tending to show the correctness of the books, and that the above sum was the true balance due by the defendant, after paying over certain sums to his successor. It was shown also that, under a general system, money was paid into the treasury under receipt-warrants issued by the auditor, an account of which was kept on the books in the auditor's office, and that the books and reports of the auditor's office corresponded with the books in the treasurer's office and treasury statements. It was shown that the shortage, as evidenced by the books, was known in January or February preceding the trial in June.

On behalf of defendant it was insisted that there were errors in the books, which, if found, would show that the alleged deficit was only apparent, and that the defendant was not a defaulter. The books were very voluminous, and it was claimed that it required great labor and considerable time to make an examination of them. Witnesses for the defendant pointed out certain entries in the books which were alleged to be errors, but the testimony of witnesses on

behalf of the state in rebuttal tended to show that these alleged errors did not in fact exist.

The testimony showed that in January, 1887, an examination was made of the books in the treasurer's office by a legislative committee, and that the money on hand was then counted. It was also shown that the money was again counted by the same legislative committee in January, 1888. The amount due the state at the time of this count also was found to be on hand. Members of the committee testified to the correctness of the count in each instance, and to the fact that the money to correspond was then in the treasury. There was no evidence showing that the defendant had actually converted or used any of the money, though the state offered much testimony as to this, and it was shown that he paid over to his successor all the money on hand in the treasury vaults at the expiration of his term—that is to say, it was paid in different amounts at different times, beginning January 6, and ending February 19, the total sum paid over being $276,835.90. During part of this time the defendant and his former bookkeeper were sick. There was no explanation of the deficit above stated, and no effort to explain it, further than the attempt to show that the books had not been correctly kept, and that the account contained errors, together with defendant's statement, made before the legislative committee, that he had not used or misappropriated the money, and did not know what had become of it if it was short.

Defendant proved a previous good character, and there was evidence tending to show that during the whole term of office he did not live extravagantly or ostentatiously; that he did not attempt to falsify the accounts, or resort to any fraud or artifice to conceal the deficit; that he remained in Jackson, where he lived and had engaged in business after the expiration of his term of office; that other persons who were employés in the treasurer's office knew the combination of the locks to the vaults and had access to the money; that the defendant was often away from Jackson, and was several times sick, during which time the business in the treasurer's office was necessarily conducted by others; and there was no proof that the defendant had been engaged at any time in extravagant expen-

ditures and hazardous speculations. It was shown that the books of the treasurer's office had been detained by the state for official examination several months after defendant's term of office expired, and witnesses for defendant testified that after he was given access to the books there had not been sufficient time to make an examination.

There was no demurrer to the indictment, and no motion to quash. After the trial had begun, and after the state had closed its evidence, the defendant made a motion to compel the state's counsel to elect under which count of the indictment the prosecution would proceed. The motion was overruled, and the defendant excepted.

At the instance of the state, the court gave the jury twelve instructions. On behalf of the defendant it gave thirteen, and refused twenty-four instructions. Defendant excepted to the action of the court in giving and refusing the instructions. All the instructions are hereinafter set out.

Defendant, being convicted, made a motion in arrest of judgment, on the ground that the indictment charged no offense. This motion was overruled, and the defendant excepted. The jury returned a general verdict of guilty without mentioning on which count the defendant was convicted, the language of the verdict being as follows: " We, the jury, find the defendant guilty as charged in the indictment, and respectfully recommend him to the mercy of the court."

Motion for a new trial being overruled, the defendant excepted and appealed. The record contains all the evidence.

The defendant did not testify on the trial of the case, but it was shown that there had been an examination of the books in the treasurer's office by a legislative committee in March, 1890, and the members of this committee testified as witnesses for the state to the result of their examination and the condition of the books, and it was shown that the defendant had testified before the committee. The substance of what he stated in giving this testimony was introduced in evidence by the state. It was shown among other

things that he testified before the committee that he had never while in office counted the cash in the treasury.

The following written interrogatories to the defendant and his answers thereto, which had been read before said committee when making the examination of the treasurer's office, were introduced in evidence by the state :—

"Interrogatories to be propounded to Col. Hemingway.

1. Does the balance of $555,450.02 which appears in your report for 1890, represent the *cash* balance?

Ans. It was so intended.

2. Assuming that this amount does represent the cash balance, do you know of any credits to which you are entitled before Dec. 31st, 1889, which were not given in your report?

Ans. My printed reports are intended to show all credits to which I am entitled, but I feel sure they do not, though I have not had the opportunity to ascertain where the errors lie, as I have only had access to the books a few days since discovering the discrepancy between the balance charged against me and the cash in the treasury.

3. Please state to the committee what balance in cash you should account for on account of insurance deposits and, also, state whether or not the insurance deposits were included in the balance ot $555,450.02.

Ans. The insurance deposits were not included in the general balance of $555,450.02. I held on the 1st of Jan'y, 1890, as cash to credit of such deposits $100,000. Thereafter I took up and cancelled $55,000.00 of bonds held by me for depositing insurance companies, who took certificates showing indebtedness of the state to that amount, and then I charged myself with $55,000 as cash received on account of such deposits.

4. State what amount of United States bonds, or other U. S. securities should have been delivered to your successor on account of insurance deposits.

Ans. $125,000, U. S. bonds.

5. State what amount of Miss. state bonds should have been delivered to your successor on account of insurance deposits.

Ans. $120,000, state 4% bonds.

6. If there are credits to which you are entitled, which do not appear upon your report, please give a detailed and itemized statement thereof, to what funds, etc., including amount of cash delivered to your successor and other vouchers, which will affect the cash balance.

Ans. I paid to my successor these amounts as cash, or representing cash :—

| | |
|---|---:|
| Cash | $225,323.90 |
| Warrants | 15,074.90 |
| 5% coupons | 2,350.00 |
| 6% coupons | 19,182.00 |
| 4% bonds, due Jan'y 1st, 1890 | 216,000.00 |
| Total | $507,910.85 |

That part of interrogatory relating to credits, answered in answer to 2d interrogatory.

7. State any other fact in your possession which will shed any light upon the true balance which may be due by you to the state, or which may be due you by the state.

Ans. I did not keep the books of the treasury, and supposed they were kept correctly, but when I discovered in making my settlement with my successor, the immense discrepancy between the balance charged against me and the cash on hand, I was startled with the knowledge that the books or reports must be wrong, as I felt it was impossible that any such real shortage could exist, and I feel sure that a thorough investigation of the books and vouchers in connection with all the transactions of the office for the last fourteen years will show the large credits to which I am entitled and which has not been credited to me. I know that the balance shown against me by the books is false, for I know I have not taken the money and am sure that it was not taken by any of my assistants.

W. L. HEMINGWAY."

In the concluding argument to the jury the district-attorney alluded to certain matters and made certain comments that were objected to by counsel for the defense upon the ground that they

were not justified by any facts proved in the case, and that they were improper and calculated to prejudice the defendant and mislead the jury. In view of the opinion of the court, it is not deemed necessary to set these matters out in detail, or to add anything by way of statement to the observations made as to this in the opinion.

The following instructions were given for the state :—

" 1. If the minds and consciences of the jury are fully satisfied from all the evidence in this case that W. L. Hemingway, defendant, received, as treasurer of the state of Mississippi, moneys of the state amounting to $315,612.19, or any part thereof, more than he disbursed according to law and paid over to his successor, and that the whole evidence shows no reasonable excuse for his failure to pay it over to his successor in office, and raises no reasonable doubt of his innocence, then he is guilty of embezzlement and the jury should convict him."

" 2. If the jury believe from the evidence that Hemingway wilfully made way with the moneys of the state as charged in the indictment, then the jury should find him guilty as charged in the first count of the indictment."

" 3. If the jury believe from the evidence that Hemingway as treasurer of the state wilfully and fraudulently disbursed or otherwise made way with the moneys of the state that came into his hands, save in the payment of warrants lawfully drawn on the treasury, or in the payment of bonds and interest and interest coupons or in the payment of loans made to the state treasury, then he is guilty of embezzlement and the jury should so find."

" 4. If the jury believe from the evidence that Hemingway on final settlement with the state is due the state any sum of money received by him as treasurer, which he has not disbursed according to law or paid over to his successor, then it devolves upon him to explain what became of it, and to give a reasonable excuse for such failure to pay over, and if all the evidence in the case furnishes no reasonable explanation of what became of said money and raises no reasonable doubt of his guilt, he is guilty of embezzlement and the jury ought to convict him."

"5. The jury are instructed that in a prosecution for embezzle-
ment against a state treasurer, the state is not bound to prove any
positive acts of concealment in connection with the public moneys
intrusted by the people to his safe-keeping. It is sufficient if the
testimony proves that the defendant has made way with the
money, or gotten rid of it wilfully and fraudulently in any manner
not allowed by law in the disbursement of such funds, or upon
the state's account. Nor is it necessary under the first and second
counts of the indictment for the prosecution to show that the
accused still has the money in his manual possession or under his
control."

"6. If the minds and consciences of the jury are fully satisfied
that W. L. Hemingway as treasurer received more of the state's
money than he paid out legally or paid over to his successor, and
the whole evidence in the case furnishes no reasonable explanation
of what became of it, then you ought to convict him of embezzle-
ment as charged in the indictment, and you should not excuse the
defendant's failure to pay over such money on any mere conjectural
or imaginary ground, or on any ground which the evidence does
not reasonably show the fact exists."

"7. If the jury believe from the evidence beyond all reasonable
doubt that Hemingway as treasurer of the state had at that time
any part of the $315,612.19 charged as the balance against him on
the expiration of his office, and that on the expiration of his office
he omitted, as charged in the indictment, to turn it over and de-
liver it to his successor, then he is guilty as charged in the third
count in this indictment, whether he converted any part of said
money to his own use or not."

"8. The court charges you that if your minds and consciences
are fully satisfied that the defendant received more of the state's
money as treasurer than he paid out lawfully and which he has not
paid over to his successor in office, and undertakes to account for
and excuse his failure to so pay it over to his successor by his
simple denial that he converted it to his own use, then the burden
of such explanation being upon him, unless you are satisfied that

such explanation is reasonable, you should disregard it and convict him."

" 9. The law presumes that the auditor and treasurer each complied with the law in making charges and credits on their books as to receipts and disbursement warrants, and as to furnishing each other with monthly statements of the same, and the law also presumes that their books are correctly kept, and if the incorrectness of the books are relied upon as a defense in this case, it devolves upon the defendant to show such incorrectness, unless the evidence as a whole raises a reasonable doubt that the books are correct."

" 10. If the jury believe from the evidence that Hemingway on the 6th of January, 1890, had on hand any money of the state which he wilfully and feloniously omitted to deliver to his successor in office, then he is guilty under the third count of the indictment whether he converted the money to his own use or not."

" 11. If the jury believe from the evidence beyond a reasonable doubt that during his term of office as state treasurer the defendant received into his hands as such treasurer the sum of $315,612.19, or any part thereof, over and above all sums lawfully disbursed by him, and that he has failed to pay the same over to his successor or to give any reasonable account thereof, then it is the duty of the jury to find him guilty as charged in the first count of the indictment, unless the evidence in the case raises a reasonable doubt of the actual conversion by said Hemingway of said moneys to his own use."

" 12. The court instructs the jury that in considering this case you should not go beyond the evidence to hunt for doubts, nor should you entertain such doubts as are merely chimerical or based upon groundless conjecture. A doubt, to justify an acquittal, must be reasonable, and arise from a candid and impartial consideration of all the evidence in the case ; and then it must be such a doubt as would cause a reasonable, prudent and considerate man to hesitate and pause before acting in the graver and more important affairs of life. If, after a careful and impartial consideration of all the evidence in the case, you can say and feel that

your minds and consciences are fully satisfied of the guilt of the defendant, and are fully satisfied of the truth of the charge, then you are satisfied beyond a reasonable doubt and to a moral certainty. The proof is to be deemed to be beyond a reasonable doubt and to a moral certainty when the evidence is sufficient to impress the judgment of ordinarily prudent men with a conviction on which they would act, without hesitation, in their own most important concerns or affairs of life."

The following instructions were given on behalf of the defendant:—

"1. In reference to the instructions given for the state, the jury are now charged that any of them devolving on defendant the necessity of explanation, is satisfied if the evidence anywhere raises a reasonable doubt of his guilt in their minds."

"2. Before the jury can properly bring in a verdict of guilty in this case, they must all be satisfied by the evidence to a reasonable moral certainty of the existence of all these facts, that is to say : That money, actual money, of some of the kinds specified in the indictment, and not bonds or coupons or certificates of indebtedness, was wilfully and fraudulently misappropriated and converted to his own use from the state treasury by wilful, fraudulent design by some one, and that *that* some one was William L. Hemingway and no other person, unless with his knowledge and sanction ; or that William L. Hemingway, having the money, wilfully and fraudulently omitted to pay it over to his successor. If they reasonably doubt either of these propositions, they should acquit."

"3. The law does not authorize a conviction of embezzlement on faulty book-keeping, and, unless the jury are satisfied from the evidence in the case of these facts, that is to say : (1) that the books are correct to the extent, at least, of properly showing some balance in actual money not paid over ; and (2) that the defendant, and no other, unlawfully converted it to his own use, or that he, having it, wilfully withholds it from his successor—they must acquit."

"4. Even should the jury believe from the evidence that money was misappropriated, nevertheless, if they further believe from the

evidence that others besides defendant had access to the money in the treasury, they should acquit the defendant of this, unless they are satisfied to a reasonable moral certainty, and by the evidence in the case, that defendant, and no other person, so converted it, and, in this inquiry, they should bear in mind that the law presumes every man innocent until his guilt is established beyond all reasonable doubt."

" 5. Under the indictment in this case the jury cannot convict unless they believe from the evidence beyond every reasonable doubt that W. L. Hemingway fraudulently withheld from his successor, or converted to his own use, actual money."

" 6. Good character of the accused if proved in the case is a fact like any other fact in the case for the consideration of the jury and is entitled to such weight as they may in their judgment think should be given it."

" 7. The law requires full and satisfactory proof of guilt before the jury can convict. The proof of the guilt of the particular defendant charged with the crime must be inconsistent with any other rational hypothesis. If in the minds of the jury, without being sought after, a doubt fairly and naturally arises as to the guilt of defendant, after comparing the whole evidence and deliberately considering the whole case, they must give the benefit of this doubt to defendant. If, upon such comparison and consideration, the minds and consciences of the jurors are not absolutely and firmly satisfied of defendant's guilt—if moral certainty is not produced—if the judgment wavers and oscillates, the charities of the law and the presumption of innocence concur in requiring the jury to find the accused not guilty."

" 8. While the treasury statement is evidence of the balance due by the defendant to the state, it is not conclusive and if certain errors in it have been shown to the satisfaction of the jury, these errors may be considered in determining the weight to be given to it, and such conclusions drawn therefrom as reasonably arise in their minds. And they may also consider in this point of view the evidence touching the manner in which, and the party by whom the books were kept, and the statement prepared."

" 9. If the jury believe from the evidence that the cash account on the books of the treasurer was mixed up with bonds, or certificates or warrants or any other evidence of debt, then the balance shown (if any) by said cash account is not evidence of a receipt of that much money, nor that Hemingway had that much money in his hands at the end of his term, unless the evidence further shows that all bonds, certificates, warrants or other evidence of debt have been eliminated from said balance."

" 10. The jury are the sole judges of the credibility of witnesses and of the weight of the evidence. While opinions of experts are competent evidence, such opinions are not to be accepted as conclusive, but they are like any other testimony, and such credit is to be given them as under all the facts and circumstances the jury believe they are worth. The jury must found their verdict on their own belief based upon all the evidence in the case."

" 11. The statement of the defendant to the legislative committee should be considered by the jury as a whole, and such weight should be given to each part of it, that which makes for the accused as well as that which may make against him, as the jury may believe it entitled to receive, considering it in connection with the other proof in the cause, its reasonableness or unreasonableness, probability or improbability."

" 12. The weight to be given to the evidence and every part of it is a matter for the jury to determine; and, although the jury may believe from the evidence that the defendant received money of the state for which he has not accounted, still they cannot convict him unless that fact, considered in connection with all the other evidence in the cause, satisfies them to a reasonable moral certainty either that he fraudulently appropriated it, or that, having it in his possession or under his control, he fraudulently omitted to deliver it to his successor."

" 13. While the discrepancy between the amount of cash turned over and the amount shown by the books to be due is evidence for the jury, it alone cannot justify conviction unless it satisfies the jury of defendant's guilt beyond every reasonable doubt."

68 MISS.—25

The court refused to give the following instructions asked by defendant :—

"14. While the unexplained books and reports of a public officer showing a balance due are evidence to establish a liability therefor in a civil proceeding, in a criminal case, to make such balance evidence of a receipt of the money by W. L. Hemingway, it must appear from the evidence that the defendant himself kept such books, or himself directed the entries made to be made therein with full knowledge of their character, or with such knowledge made up or signed such reports himself, or with such knowledge directed the entries to be made therein, and if from the evidence the jury are satisfied beyond a reasonable doubt that Hemingway with such knowledge neither made the entries in the books or reports, nor directed them to be made, then such books and reports are not evidence of the receipt of money."

"15. Under the indictment the charge is embezzlement of money only, and to convict, the state must prove, beyond a reasonable doubt, that W. L. Hemingway unlawfully converted to his own use the money of the state in manner and form as charged in the indictment."

"16. To convict the defendant the jury must believe to a moral certainty from the evidence that W. L. Hemingway himself unlawfully converted the state's money to his own use, and by unlawful conversion is meant that he took the state's money and used it for his own private purposes and did not pay it over on demand."

"17. Under the third count of the indictment the jury cannot convict the defendant unless they believe from the evidence, beyond a reasonable doubt, that the moneys charged therein and thereby to have been embezzled were in his hands on the sixth day of January, 1890, and that on that day he wilfully and feloniously defrauded the state thereof, by not delivering the same over to his successor in office. If the jury believe from the evidence that on the said sixth day of January, 1890, the defendant turned over to his successor all of the moneys then in his hands and withheld none, or, if they have a reasonable doubt arising from the evi-

dence or want of evidence on this point, they will find the defendant not guilty under the said third count.".

"18. Before the jury can convict under the first and second counts of the indictment, they must be satisfied, beyond a reasonable doubt, as defined by the court, that he converted to his own use some of the moneys of the state, of the character set out in the indictment, and failed to pay over the same to his successor in office on demand for that purpose. The treasury statement offered in evidence is competent to show that the balance stated was due by the defendant to the state, but is not by itself alone evidence of an actual conversion of the balance reported to be due, or any part thereof. It was incumbent on the state, under said counts, to establish a conversion in fact, and unless this has been done to the satisfaction of the jury, beyond a reasonable doubt, they will acquit."

"19. If the whole evidence raises a reasonable doubt in the minds of the jury of the correctness of the books, so that they reasonably doubt defendant's guilt, they should acquit."

"20. The whole question in this case is whether or not defendant defrauded or attempted to defraud the state by wilful design. If it is proven beyond a reasonable doubt that he did, he is guilty and should be convicted, but if the jury reasonably doubt it from the evidence or the want of evidence they should acquit him."

"21. If the jury believe from the evidence that in the year 1878 the yellow fever was epidemic in Jackson; that in consequence thereof all business was suspended and all the state officers left the city and remained absent, from the breaking out of the epidemic until some time in November of that year; that the watchman at the capitol and treasury department died during the epidemic; that in 1879 the yellow fever scare seized the community on account of the breaking out of the dread disease in Memphis and on the gulf coast of Mississippi, and that defendant left with his family, went to the home of his brother in Missouri and was absent from some time in June until the month of October; that in 1888 there was another outbreak of said fever and a general stampede of state officers who were quarantined out from the 20th of Sep-

tember to the 20th of October, all connection between them and the city being prohibited and prevented by the constituted health officers of the state; that, on several occasions, defendant was confined to bed for weeks from protracted illness; that several other persons had access to the treasury vaults during the incumbency of defendant, and that opportunities were thus occasioned for those skilled in such work to make burglarious raids on the treasury— before they can find the defendant guilty, they must be satisfied from the evidence, beyond a reasonable doubt, that the public moneys were stolen or embezzled, that no other person than the defendant, and that he alone, is the guilty party."

" 22. If in the case of a public officer prosecuted for the embezzlement of a large sum of money, the jury believe from the evidence that he has not absconded or attempted to abscond; that he has made no false entries in his books of account, or otherwise sought to practise any deceit in respect thereto, and that there is no proof of a specific fraudulent conversion apart from a general deficiency in his cash balance, such facts may properly be considered by them in determining the question of his innocence or guilt."

" 23. In the case of a public officer charged with the embezzlement of a large sum of money the facts that he has not absconded or attempted to abscond; that he has made no false entries in his books of account or otherwise sought to practise any deceit, trick or concealment, together with the absence of all proof of extravagant expenditures or hazardous speculations and a failure by the state to show any specific fraudulent conversion apart from a general deficiency in his cash balance, are circumstances highly favorable to him; and conducive to a conclusion of his innocence."

" 24. In the case of a public officer charged with embezzlement of a large sum of money, the facts that he has not absconded or attempted to abscond; that he has made no false entries in his books of account, or otherwise sought to practise any deceit, trick or concealment, together with the absence of all proof of extravagant expenditures or hazardous speculations, and a failure by the state to show any specific fraudulent conversion apart from a general

deficiency in his cash balance, are circumstances that the jury may properly consider in determining upon his innocence or guilt."

" 25. The court instructs the jury that it is incumbent upon the prosecution to prove every material allegation of the indictment as therein charged. Nothing is to be presumed or taken by implication against the defendant; the law presumes him innocent of the crime and of every criminal act included in the crime until he is proven guilty beyond a reasonable doubt by competent evidence. And if the evidence in this case leaves upon the minds of the jury any reasonable doubt of defendant's guilt, the law makes it your duty to acquit him."

" 26. The court instructs the jury that evidence of previous good character is competent evidence in favor of a party accused of crime, as tending to show that he would not be likely to commit the crime alleged against him; and in this case you should consider the good character of the defendant previous to the alleged crime, in connection with all the other evidence given on the trial, in determining whether the defendant would be likely to commit the crime in question, and unless you can say beyond every reasonable doubt that he did, it is your duty to acquit."

" 27. If there be any fact or circumstance in the cause susceptible of two interpretations, one favorable and the other unfavorable to the accused, and if when the jury have considered such fact or circumstance in connection with all the other evidence, they are in doubt as to which is the correct interpretation, they will resolve such doubt in favor of the accused and place upon such fact or circumstance the interpretation favorable to him."

" 28. Before the jury can convict, the state must prove beyond a reasonable doubt some specific act of embezzlement; it is not sufficient to show a liability on a general accounting, but some particular conversion of some particular sum of money must be proven."

" 29. The law starts out with the presumption that the defendant is entirely innocent of the whole charge, and every part and parcel of it, and the jury are never authorized to convict on vague suspicions, suppositions, or conjectures. They should reconcile all the

evidence to accord with the theory of his innocence, if they can, and if they cannot, they must still acquit, unless guilt be proven by the evidence to a reasonable moral certainty, which means beyond every reasonable doubt arising out of the evidence or the want of evidence."

"30. Proof of neglect to pay over to his successor money received by the accused, does not, by itself, constitute embezzlement, and such neglect, without other incriminating circumstances, is not enough to warrant a verdict of guilty."

"31. Proof of not paying over money to his successor by the accused does not alone, and without other inculpating circumstances, make embezzlement, and it is not alone ground for conviction, such proof being at most only a fact which the jury may consider, in connection with all the facts and circumstances, in determining the question of fraudulent intent. To convict on this, it must appear to a reasonable moral certainty that he had the money and fraudulently refused to turn it over."

"32. Even should the jury believe from the evidence that money was misappropriated, nevertheless they may consider whether others besides defendant had access to the funds, and whether they may not have been abstracted by some one disconnected with the treasury department, and if they have a reasonable doubt that defendant himself is guilty, they should acquit him of the misappropriation."

"33. If the jury shall believe from the evidence that it is as probable that some other than defendant took the money as that defendant did, they should acquit him of this, even if they believe from the evidence that money was taken, and they should acquit of this even if they have a reasonable doubt as to the matter."

"34. One of the definitions of a reasonable doubt is that it is a doubt for which a reason can be given, and if in this case the jury can give a reason for a doubt they have, from the evidence or the want of evidence of defendant's criminal liability, they should acquit him."

"35. In reaching a conclusion, the jury may consider the general good character of defendant for honesty and integrity; his social

surroundings; his remaining in the city after, by actual count in the treasury, his shortage was discovered; his engaging in business as if no such shortage existed; the facts that there is no false or fraudulent entry on his books, and that his own account as rendered forms the basis of the prosecution, and all the other facts in evidence, inconsistent in their minds with the theory of guilt, and, in reaching a conclusion, to give such weight to all these as, in their judgment, is reasonable and just."

"36. It was necessary, under the third count of the indictment, that the state should prove that J. J. Evans was elected as the successor of the defendant, and had given the bond and taken the oath of office required by law, before a verdict could be demanded at the hands of the jury. Proof that Evans made the demand on Hemingway, and that defendant failed to turn over to him funds in his hands, is not sufficient."

"37. To establish the correctness of the balance of indebtedness claimed, the state must show that the accused, W. L. Hemingway, received in money all that he is charged with, and disbursed nothing more than he is credited with; and if the jury believe from the evidence that the state has failed thus to establish the correctness of said balance shown by his books, it is a circumstance for them to consider in reference to the question of whether or not there is any real deficiency."

The opinion of the court contains a further statement of the case.

*Nugent & McWillie*, for appellant.

1. The court erred in overruling the motion in arrest of judgment. (On this point counsel filed a lengthy written argument, commenting upon the several sections of the statute referred to in the opinion of the court in connection with the several counts in the indictment, and cited the following authorities : *Bracey* v. *State*, 64 Miss. 17; *Williams* v. *State*, 42 Ib. 328; *Lewis* v. *State*, 49 Ib. 354; 54 Ib. 490; 55 Ib. 421; 22 Kan. 170; *Commonwealth* v. *Dean*, 108 Mass. 349; 32 La. An. 620; 35 Ib. 901; 82 Ill. 425.)

2. The books kept by defendant were shown by the state to be

correct. They showed a shortage of over $300,000, which the appellant could not account for. It was shown that every dollar in the treasury was turned over to his successor. The jury was instructed to presume that the money was in defendant's hands, because it was shown to have been there at one time, and on this presumption to base a verdict. There was no evidence of a conversion, and no evidence that the defendant had the money in his possesssion. If having the money was an essential ingredient, as we believe it was, it must have been alleged and established by evidence. On this view the 17th instruction was asked for the defendant, and so of the 30th and 31st. But the instructions were refused. The defendant was forced to trial under an indictment which required proof that the money was in his hands, and yet the court refused to allow the jury to determine the fact. In effect, it told the jury to convict the defendant if he received the money and did not pay it over. This could not be done, particularly under the view taken by this court of section 2789. *Commonwealth* v. *Dean,* 109 Mass. 349 ; 6 Am. & Eng. Ency. L. 469, note 2 ; Ib. 465, and note 4, and authorities there cited.

3. The court should have continued the case. The proper defense could not be made with the uncertainties staring defendant and his counsel in the face as to the correctness of the books. Experts were at the time engaged in the examination, which could not be made within the time that had elapsed. If the books were erroneous, this would exonerate the defendant. He asserted his innocence of the crime, and his counsel were bound to act on this assertion. If the books were correct, then they must show a different state of facts to obtain an acquittal. To do this, they had not sufficient time for inquiry and determination.

4. The court erred in overruling the motion for a new trial. The jury found contrary to the law and evidence. The court erred in its action on the instructions, and the conduct of the state's attorney in making the closing argument was not warranted, and seriously prejudiced the appellant. The position of district attorney affords the largest scope for impressing a jury to the prejudice of defendant if he permits himself, as the counsel did in this case, to

go outside the record.   The statements of the prosecuting officer must be of facts and pertinent to the issue or their natural tendency must be to influence the finding of the jury.   68 Ala. 476 ; 18 Tex. 524.

Vehement declamation based on conjectures, though attempted to be justified by the thin veil of illustration, swerves jurors from the straight path.   This is not to be tolerated.   The change in our system disallowing the accused the concluding argument proceeds on this idea.   It was supposed that a public officer under the sanction of an oath would not depart from the recognized lines of duty.

(Counsel here made a lengthy review of the assertions and statements made by the district-attorney in his closing argument in the endeavor to show that the prosecuting attorney had gone outside of the evidence and had made improper comments, thereby prejudicing the defendant and causing the jury to return a verdict of guilty.)

*Calhoon & Green*, on the same side.

1. The court erred in refusing a continuance.  The court held that the balance shown by defendant's books was *prima facie* correct, and that it devolved upon him to explain this and show errors, yet he was not permitted to do so.   It was impossible to go over the accounts and vouchers of fourteen years at the trial, and defendant had no opportunity to have the examination made before trial.

2. The court erred in denying defendant's motion to require the district-attorney to elect on what particular acts of embezzlement and on which count of the indictment he would rely.   *King* v. *State*, 66 Miss. 502.

3. The motion in arrest of judgment should have been sustained. Under § 2787 of the code it was necessary to allege and prove both a conversion *and* a failure to pay over when required.   The first two counts fail to allege both.   These counts are not referable to § 2788, because they fail to allege a "wilful refusal or neglect" to pay over, on demand.   For the same reason, they cannot be sustained under § 2789, which manifestly has reference to false entries, certificates or the like, not previously provided for.   Nor are they

referable to § 2790, which embraces only other fraudulent acts not specifically provided for in the preceding sections.

The third count was drawn under § 2789, but it does not charge an offense under that section. Besides, no judgment could be pronounced under that section, because it did not find the value of the thing embezzled. *Jenkins* v. *State*, 41 Miss. 582.

4. (Here counsel reviewed at great length the numerous instructions, urging that the court erred in giving those for the state and refusing charges asked by the defendant. The following is a synopsis of the main points presented in this branch of the argument) :—

Defendant could only be convicted on this indictment for failure to pay over *money*.

Under the third count, it was necessary to prove that he had it in hand and refused to pay over. Code 1880, § 2788.

Mere proof of shortage and the failure to pay over could not support a conviction. A criminal intent was necessary. There could be no embezzlement without unlawful design. *People* v. *Hurst*, 62 Mich. 276 ; 10 Ib. 54 ; *Fitzgerald* v. *State*, 50 N. J. L. 475 ; 98 Am. Dec. 134, 169 ; 30 Ill. 373 ; 31 Cal. 108 ; 77 Ib. 120 ; 35 La. An. 901.

The glaring error in the state's instructions is that they held the shortage in the books *prima facie* evidence of guilt.

The burden of proof could not be cast upon the accused ; it never shifts. *Hawthorne* v. *State*, 58 Miss. 778 ; 62 Ib. 142, 273 ; Wharton's Cr. Ev. § 526.

To constitute embezzlement there must be proof that the officer converted the money, or concealed it with intent to convert. 78 Ala. 31 ; 1 Roscoe's Cr. Ev. 473, 619 ; *Rex* v. *Hodgson*, 14 Eng. C. L. 377 ; *Rex* v. *Jones*, 8 C. & P. 288 (34 Eng. C. L. 100).

As in larceny, criminal intent is the basis of the offense. 1 Roscoe's Cr. Ev. 617 ; *Beatty* v. *State*, 61 Miss. 18.

Defendant did not keep the books, and cannot be criminally responsible for any balance they show. It is no answer to say he could supervise the bookkeeping. He is not indicted for negligence as to this. Wharton's Am. Cr. L. §§ 662, 667, and notes.

In this case a reversal is a necessity in the light of the decisions of this court in *Lamar* v. *State*, 64 Miss. 428; *Gerdine* v. *State*, Ib. 798.

5. There was not a scintilla of evidence tending to show a conversion or use of any of the funds by defendant. He did not keep the books. Others necessarily had equal access to the money. Often he was absent. There was no proof of extravagance, no speculations, no effort at concealment, no suspicious conduct. It is remarkable that a man of good character, under such circumstances, should have been convicted of the embezzlement of $315,000 on a mere book-balance. The whole life of the man contradicts such a conclusion. In the light of these facts, the court should consider the closing argument of the district-attorney. It bears upon its face its own severest condemnation. Manifestly it was prejudicial to the accused. *Martin* v. *State*, 63 Miss. 505; 55 Ib. 153; 56 Ib. 299.

6. The cases cited by opposite counsel for the proposition that failure to pay over is evidence of conversion, and unexplained will sustain a conviction of embezzlement (3 Heisk. 78, and 6 Caldw. 307) are under the Tennessee statute, which makes the "rules of evidence the same in criminal as in civil cases, unless otherwise provided." Code of Tenn. § 5376. On this point, see *State* v. *Snell*, 9 R. I. 112; 2 Arch. Cr. Pl. & Pr. 1353 *et seq.*

There must be some evidence of conversion outside of an account kept by another.

The statutes of several of the states and of the United States make the amount shown by the officer's books evidence against him in criminal cases. The necessity for these statutes shows what the rule is in the absence of any such enactment.

*A. J. McLaurin*, on the same side.

1. As to the instructions given for the state.

The second and third instructions are to the effect that if the jury believe the facts therein recited they should convict, without the qualification that their belief must be such as to leave no reasonable doubt. True, this was in a measure modified by the defendant's instructions, but the error was not cured. An instruction

ought not to be given upon the assumption that the defendant will ask one that will cure the error, and that the jury will compare the two.

The 10th instruction is subject to the same criticism. *Holly* v. *State*, 55 Miss. 424.

The 4th and 8th instructions improperly placed the burden of proof on the defendant. *Pollard* v. *State*, 53 Miss. 410; *State* v. *Wingo*, 89 Ind. 204.

The 9th instruction is erroneous. As against the defendant, the auditor's books could not be presumed correct. He had nothing to do with the making of that record, and could not be tried by it. The proposition announced in this instruction is revolting to me.

2. As to defendant's instructions that were refused:

The 15th instruction ought to have been given. It announces that the state must prove its charge as made in the indictment.

By the 16th instruction the court was asked to charge the jury that the defendant was only liable criminally for his own wrongful acts. Surely this is the law and should have been given.

The 17th instruction was in reference to defendant's criminal liability under the third count in the indictment. After other provisions making it criminal to use the state's money for private purposes or to convert it, or to loan it, the section under which this count was drawn makes it criminal if the defendant has the money and does not turn it over to his successor. The instruction properly states the law on this subject and should have been given.

How the 19th instruction was refused I am unable to see. If there is a doubt upon the whole evidence, surely defendant should be acquitted. *Holly* v. *State, supra.*

The 20th instruction announces such a plain principle of law that it requires no argument. If the facts assumed in the 22d instruction existed, the defendant should have had the benefit of them. If the reverse of those facts had been true, certainly it would militate against the defendant. This being so the defendant was entitled to the instruction.

The same is true of the 24th instruction.

The 25th instruction asked surely propounds a correct legal proposition. *Pollard* v. *State, supra; Holly* v. *State, supra.*

The 26th instruction is clearly the law. If it be true that the defendant is entitled to all reasonable doubts, then the 27th instruction ought to have been given. A logical mind before reaching a conclusion analyzes the case and ascertains what facts are found and what are not found, and then makes up a conclusion on all the facts in evidence. Surely this is the only safe course.

The court was asked to tell the jury that in making this analysis they ought to give the defendant the benefit of doubt on any question, and this is clearly the law. See Philips' Famous Ca. of Cir. Ev. Intro.

I respectfully submit that the judgment of the circuit court ought to be reversed.

*T. M. Miller,* attorney-general, for the state.

1. The continuance was properly refused. The application was simply one for time to make an examination of the books kept by the defendant himself, or under his own direction, during a period of fourteen years, in order to determine whether they were correct. On the trial it was made to appear that the books were on a balance with those in the auditor's office and had been correctly kept. Besides all this, the defendant's shortage was known in January, 1890; therefore he had six months to discover errors if any existed. It was senseless to go back of the balance of 1886, for the money was then on hand. Owing to the system of receipts and disbursements, an examination of the books was simple.

2. The court properly overruled the motion in arrest of judgment. There was no motion to quash and no demurrer. Where there are several counts, it is discretionary with the court to allow the prosecution to proceed upon all. 1 Bish. Crim. Pro. §§ 449–451; 28 Miss. 267; 37 Ib. 422.

A motion to arrest will not be sustained where a general demurrer would not prevail. The verdict, being general, will be referred to the good count if the others are defective. Therefore the motion in arrest could not be sustained unless all the counts are so radically defective as that no crime is charged.

3. The first and second counts in slightly varying terms are maintainable under § 2790 of the code. True, the facts proved in this case might have sustained an indictment under §. 2787, but it is not for the accused to elect under which statute he will be prosecuted, if the same act gives rise to different offenses. To say that § 2790 cannot apply to the crime of embezzlement committed by a state treasurer, is to assume that it was never intended to punish that officer for the fraudulent conversion of money so severely as others.

Section 2790 covers the commonly understood case of fraud and embezzlement where there is a criminal intent—a *lucri causa*. And in this it is distinguishable from § 2787. Embezzlement as declared in § . 2790 is the *fraudulent* conversion of property or money by a person to whom it has been entrusted; and is only distinguishable from larcency in that the taker comes lawfully into possession. *State* v. *Wingo,* 89 Ind. 204; 2 Bish. Crim. Law, § 326.

In the third count, framed under § 2789 of the code, it was not required to set out the offense or to do more than charge a fraud in respect to the particular moneys by a wilful omission of duty. Under § 248 of the code, it was the duty of the treasurer, without any demand, to pay over all public moneys to his successor. As the defendant failed to demur and made no motion to quash, but went to trial on the whole indictment, and, since the facts charged are included in the general charge of embezzlement, he cannot complain if upon the whole record guilt is clearly established.

4. The jury were distinctly told that they could not convict the defendant unless they believed beyond a reasonable doubt that he made way with the state's money or converted the same to his own use with fraudulent intent; and further, the instructions placed the burden upon the state to show that the defendant, and no other, took the money, and the jury were required to give consideration to the evidence of defendant's previous good character. The money was shown to have gone into his hands, and he took credit for all disbursements. A portion of the money that was turned over to his successor was in the actual possession of the defendant, and he

turned it over in small amounts at different times. Absolutely no account of the shortage of $315,000 was attempted. In the absence of any reasonable account of moneys shown to have been received by the defendant, it was not incumbent upon the prosecution to prove specific actual conversion. A mere failure to pay over is evidence of embezzlement. *State* v. *Cameron*, 3 Heisk. (Tenn.) 78 ; *State* v. *Leonard*, 6 Coldw. (Tenn.) 307.

The explanation must be reasonable. It is not sufficient for the accused to say merely that the balance shown by the books is not in his hands. The charge of embezzlement here under § 2790 is clearly established.

It may be embezzlement, although there has been no demand for the property alleged to have been embezzled, or a denial of his receipt, or false account given of it, or false statements, or false entries concerning it or a refusal to account for it. *Commonwealth* v. *Tuckerman*, 10 Gray, 173.

5. The objection to the first instruction for the state that the jury must convict if the testimony raised no reasonable doubt of defendant's "innocence" is trivial. This could not have misled the jury, and if it could, the error was cured by the instructions given for the defendant. The instructions for the defendant were so full and liberal that it is impossible that the jury could have been misunderstood the legal rights of the accused. There was no prejudice to the defendant in refusing the other instructions, and in some of them there was a plain attempt to induce the court to make an argument on the facts assumed, no principle of law being involved. The other charges containing correct principles which were refused, were substantially given in previous instructions.

6. As to the alleged misconduct of the district-attorney, I submit that the case was too clear to leave the room for the suspicion that this influenced the verdict. The whole effort of counsel seems to have been simply to awaken a sense of duty in the minds of the jury. The cases where there were reversals on account of the speeches of prosecuting counsel, were those in which the facts were exceedingly doubtful. Here the heated imaginings of the

district-attorney, although perhaps transcending in some degree the limits of legitimate argument, will not be allowed to take the place of the *explanation* the defendant was called on in the lower court to make.

*C. M. Williamson,* on the same side.

1. The defendant was not prejudiced by the denial of his application for a continuance. He merely applied for time to hunt up testimony, and the affidavit shows a want of diligence. Unless the discretion of the court is abused, it is no ground of reversal that a continuance was refused. 4 How. (Miss.) 330; 6 S. & M. 451; 7 Ib. 715; 26 Miss. 121; 33 Ib. 383; 44 Ib. 669; 52 Ib. 332. But the development on the trial showed that no injustice was done the defendant as to this.

2. There was no error in overruling the motion in arrest. If either count in the indictment is good, it will sustain the general verdict of guilty. 4 How. (Miss.) 304; 5 Ib. 250; 13 S. & M. 468; 14 Ib. 120; 31 Miss. 473.

(Counsel here made a lengthy argument to show that the indictment was good, referring to the several sections of the statute mentioned in the opinion of the court, and citing the following authorities: *Bracey* v. *State,* 64 Miss. 17; 28 Ib. 100; 24 Ib. 490; 55 Ib. 421.)

3. The instructions given for the state properly announce the law. The defendant had the benefit of all the instructions that were applicable to the case. If any of these that were refused contained correct principles of law, these principles were enunciated in the instructions which were given. It is manifest that he was not prejudiced by the refusal to give any of the instructions. 55 Miss. 414.

4. The motion to compel the prosecution to elect under which count in the indictment it would proceed, came too late; and, besides, it was a matter of discretion with the court to grant or refuse such an application. 14 S. & M. 120; 28 Miss. 267; 39 Ib. 570; 53 Ib. 439.

5. The court properly overruled the motion for a new trial. The verdict was amply sustained by the evidence. The testimony

showed that the books kept by the defendant himself were correct, and that he had received the money. There was an admitted balance against him of $315,612.19, and no attempt whatever was made to explain this deficit or to tell what became of the money. There being no reasonable excuse for the failure to pay the money over, a conviction was proper.   6 Cold. (Tenn.) 307 ; 3 Heisk. 84.

A careful reading of the district-attorney's speech will, I think, show that it does not trespass the limits of legitimate argument ; but, if the court should think differently, under the plain facts of the case, it is not ground for reversal.   64 Miss. 761.

The question is whether an examination of the record as a whole discloses error which would justify a reversal.

Argued orally by *A. J. McLaurin*, *S. S. Calhoon* and *T. A. Mc-Willie*, for appellant, and by *T. M. Miller*, attorney-general, and *C. M. Williamson*, for the state.

WOODS, C. J., delivered the opinion of the court.

1. The action of the trial court in refusing the defendant's application for a continuance is presented for our consideration in the first assignment of error.

The application for continuance is addressed to the sound discretion of the court to which it is presented, and the action of the court on such application is not to be disturbed by the appellate tribunal, unless it is apparent that there has been a palpable abuse of that discretion.   The application in this case rested upon the affidavit of the defendant, supported by the affidavit of Leroy Douglass, and states, in substance, that he, the defendant, was surprised on turning over the money in his hands, as state treasurer, to his successor, to find that there was a large shortage ; that he believed up to that time that the balance shown to be due by him by his account and report was in the state treasury ; that he believed, up to that time, that the books in the treasurer's office had been kept correctly, and that the books of the office had been entrusted to a competent and careful bookkeeper, and would show the true state of his accounts ; that as soon as practicable after this shortage was shown, he had had an experienced and competent

accountant engaged in an investigation of the books and accounts to discover the errors therein, and the cause thereof; that he believes said shortage does not really exist, but has grown out of the, unbusiness-like method and the improper manner in which said books and accounts have been kept, and that said errors will be made apparent when his employed accountant shall have had time to go over said books and restate all the accounts in a business-like manner; that the accountant has diligently pursued his investigations, in order to be ready to state affiant's accounts, but has found, it impossible to make a report and statement up to that time; that the accountant has discovered palpable errors amounting to about $40,000, and that said accountant is engaged in procuring all necessary information to make up an accurate statement of affiant's account, and that he, said accountant, can only determine the true state thereof after his labors shall be fairly concluded; and that affiant expects to be in readiness to meet the charges against him and demonstrate his innocence at the next term of the court.

We are not prepared to say that there was such an abuse of judicial discretion in denying the application, based upon this showing, as to justify our interposition. It was not an application for time to produce evidence then known and shown to be in existence, but the manifest purpose of. it was to enter upon a search for testimony which it was only believed would be discovered. The desired and missing evidence might be found, or it might not. Was the court to strike a balance in a calculation of possibilities as to such discovery, and regulate its criminal proceedings by any such application of the rule of chances?

But, in reviewing this action of the court below, we are in such position to see and judge as was then impossible. The learned judge in the trial court was constrained to hear and determine, in the first instance, without the tremendous advantage of the light that streams from the facts developed on trial. On motion for new trial, the court below occupied quite a different position than that in which it stood when first passing upon the application for continuance. It was enabled to see, in the strong light of the developed facts of the trial, the strength or weakness of the application

denied before the trial was had ; and, occupying this vantage ground of examining the question of the rightfulness of the former refusal of the continuance, in the light of all the evidence, the court, by overruling the motion for a new trial, affirmed the correctness of its original ruling.

It is our privilege to stand at the end of the trial likewise, and so standing and looking backward to the beginning, through the voluminous evidence in a finished case, we are constrained to concur in the judgment overruling the motion for the continuance.    The expectations cherished by the defendant, in view of Douglas' reported discovery of great and palpable errors in the books and accounts, were shown to be utterly vain, precisely as Douglas' errors were demonstrated before the court and jury to be fanciful and unreal errors.  It is clear to us that the defendant was deprived of no substantial right in the denial of his application for continuance ; that no possible harm resulted to him, and, hence, that there was no error in this particular.

2.  It is contended with great strength and earnestness, by counsel for the defendant, that the action of the court in overruling the defendant's motion in arrest of judgment was manifest error.    The consideration of this proposition involves an examination and construction of our statutes on the subject of embezzlement, and the attentive scrutiny of the several counts in the indictment.

The first count charges the defendant with the wilful, fraudulent and felonious conversion to his own use, and the embezzling of large sums of moneys of the state which had been intrusted to him and had come into his hands as treasurer for safe-keeping and disbursement in pursuance of his duty as such treasurer, amounting in the aggregate to $315,612.19.

The second count charges that the defendant at divers times between January, 1876, and January, 1890, received as treasurer $15,515,994.11 of moneys of the state, and that on divers days, between the dates before mentioned, did wilfully, fraudulently and feloniously embezzle and convert to his own use a portion of said sum of moneys intrusted to him and received into his hands as such treasurer, amounting to $315,612, 19.

The third count charges that the defendant, at divers times between January, 1876, and January, 1890, received and had, as treasurer, of moneys of the state $15,515,994.11 ; that J. J. Evans was duly elected treasurer in November, 1889, to succeed the defendant in that office, for the term beginning January 6, 1890, and that said Evans qualified and entered upon the duties of said office on said last-named day, as the successor of defendant; that defendant's term of office expired on January 5, 1890, and that it then and there became defendant's duty under the law to deliver and pay over to his successor all of said sum of $15,515,994.11, of moneys of the state which he had received as such treasurer, and which was then remaining in his hands, and that, on said January 6, 1890, as part of said last-named sum, there was remaining in his hands the sum of $1,068,523.04, of the moneys of the state so received by defendant as such treasurer; but that defendant, on said January 6, 1890, disregarding his duty to pay over and deliver said sum of $1,068,523.04 to his successor in office, did wilfully and fraudulently and feloniously defraud the state of the sum of $315,612.19, by wilfully and feloniously omitting to comply with his duty to deliver and pay over, on the expiration of his term of office as such treasurer, to his successor in office, a portion of said sum of $15,575,994.11 of said moneys of the state, which he had received as such treasurer, and which remained in his hands on said January 6, 1890, amounting to $315,612.19.

It will thus be seen that the first and second counts charge, in ordinary language and in the common form, the crime of embezzlement, and that the 3d count charges embezzlement in defrauding the state by wilfully and fraudulently omitting to pay over to his successor, as his duty required. With this examination of the several counts in the indictment, we see clearly what was charged in and by each.

Let us turn now and consider the several sections of the statute defining and punishing embezzlement.

Section 2787 of the code provides, in effect, that if any officer in this state, or any executor, administrator or guardian, or any trustee of an express trust, or any master or commissioner or receiver, or

any attorney-at-law or solicitor, or any banker or collecting agent, or other person engaged in like public employment, or any other person undertaking to act for others, and intrusted by them with business of any kind or with money, " shall *unlawfully* convert to his own use any money or other valuable thing which comes to his hands or possession, by virtue of his office, or employment, and shall not, when lawfully required to pay over such money or deliver such thing, immediately do so, according to his legal obligation, he shall, on conviction, be imprisoned in the penitentiary not more than five years, or be fined not more than one thousand dollars, or imprisoned in the county jail not more than one year, or by both such fine and imprisonment."

This section first appears in our laws in the code of 1880, and is the creation of an offense, prior to the adoption of that code, unknown to our jurisprudence. It is at once a collection law and a penal statute. Its terms show unmistakably that it was designed to prevent *unlawful* (not fraudulent and felonious) conversions by officers, trustees, agents, attorneys, bankers and others, *and* to coerce the paying over immediately, when required to do so, according to the legal obligation of the offender. It was intended to punish the *unlawful* (not fraudulent and felonious) conversion *and* the not paying over immediately when required to do so. There must be both an *unlawful* conversion *and,* joined or added thereto, a failure immediately to pay over the thing converted when required. Where there has been an *unlawful* conversion, under this section, and an immediate restoration when required, the offense does not exist. It is a conversion without wilful and felonious intent which is created an offense—a merely *unlawful* conversion and a refusal or failure to restore, which this section defines and punishes.

That neither of the three counts of the indictment was drawn upon this section is apparent at a glance, for they all charge a wilful, fraudulent and felonious conversion simply. The section does not support either count, nor do any of them appear to have any relation to it. It is plain that they were not in the mind of the pleader who framed the indictment. Neither count charges the

offense created by this section, and it is a vain and idle effort to attempt to connect them in any way.

Section 2788 makes it an offense for any officer in this state to fail to turn over, on demand, to his successor in office money, books, records, etc., which may be in his hands and which by law he is required to deliver to his successor. But it is useless to dwell on this section, for it is conceded on all sides that the indictment was not drawn under it.

Section 2789 requires all officers to keep in their offices an accurate entry of each sum of public money, securities, stocks, or other public property, and then declares that if any officer " shall wilfully make any false entry therein, or shall make any certificate or indorsement on any warrant on the treasury, that the same is genuine, when the same is in fact not a genuine warrant, or shall loan any portion of the public moneys, securities, stocks, or other public property, intrusted to him, for any purpose whatever ; or shall, by any wilful act or omission of duty whatever, defraud, or attempt to defraud the state, or any county, city, town or village, of any money, security, or property, he shall, on conviction thereof, be adjudged guilty of embezzlement, and fined not less than the amount or value of the money, security, stock, or other property so embezzled, or imprisoned in the penitentiary not more than five years, or in a county jail not more than one year, in the discretion of the court, or by both such fine and imprisonment."

This section provides for the punishment of three specific offenses, viz : (1) The wilful making of false entries by officers ; (2) The making of any false certificate or indorsement on a spurious warrant that the same is genuine ; (3) The loaning of any public money, etc., intrusted to the officer, for any purpose whatever ; and it is then declared further that any wilful act or omission of duty by which the state, county, city, or town is defrauded, or attempted to be defrauded, of any money, etc., shall be embezzlement.

The purpose of the section is plain and not to be controverted. Indeed, there is no controversy between counsel as to the meaning of the section. But it is insisted by counsel for defendant that, by a well-known rule of construction, the general provision contained

in the words "that any wilful act or omission of duty by which the state, county, city, or town is defrauded, or attempted to be defrauded, of any money," must be referred to and limited by the particular offenses specifically defined in the three classes of offenses before created in this section. While it may be seriously doubted whether this rule of construction has application here, for the purpose of avoiding useless argument, and to simplify the remaining discussion, it may be conceded that neither of the counts in the indictment can be supported by this section, it having reference to only the three specific crimes of, (1) making false entries; (2) making false certificates or indorsements on warrants; and (3) loaning public moneys; and then, by the general clause following, any other offenses of like character with the three specific offenses just named.

The three preceding sections of the code, 2787, 2788, and 2789, thus creating and defining particular offenses, and neither count in the indictment being drawn under nor maintainable by reference to them, we come to the last provision on the subject of embezzlement, § 2790.

After enumerating and defining specific offenses in sections 2787, 2788, and 2789, the code then furnishes a general residuum law in § 2790, covering all other classes of fraud and embezzlement not specifically provided for in the preceding three sections.

Section 2790, in language so broad and comprehensive as to include every other case of embezzlement not already particularly provided for, declares that "if any officer, or other person employed in any office within this state, shall commit any fraud or embezzlement therein, he shall be imprisoned in the penitentiary not more than ten years, or in the county jail not more than one year, or be fined."

Neither of the counts of the indictment charging any of the particular offenses specifically defined in sections 2787, 2788, and 2789, we are driven to the general law contained in § 2790. All of the counts may be referred to and maintained under this general law, unless, indeed, they are so fatally defective in structure as actually to charge no offense known to the law.

There was no special demurrer to any count, and there was no motion to quash the indictment. The motion in arrest can only be sustained if à general demurrer could be sustained, and that could only prevail where the whole pleading was so fatally defective that no judgment could be pronounced upon the verdict. It cannot be seriously contended that, in substance, either or all of the counts are so utterly defective as to charge no offense punishable under section 2790. The first and second counts charge the embezzlement in the ordinary form substantially, and the third count, with much precision and circumstantiality of averment, charges a clear case of embezzlement, and we are of opinion, therefore, that there was no error in overruling the motion in arrest of judgment.

3. The next assignment of error calls in question the court's action in giving instructions prayed by the state, and in refusing some asked by the defendant.

The first instruction for the state declares that "if the whole evidence shows no reasonable excuse for the defendant's failure to pay over the money alleged to have been embezzled to his successor in office, and raises no reasonable doubt of his innocence, then he is guilty of embezzlement," etc. The expression, "and raises no reasonable doubt of his innocence," it is contended, was incorrect in that it, in effect, required the defendant to show his innocence. We think this contention arises from a misapprehension of the meaning of the language complained of. The language is not that usually employed in charges by the courts in instructing juries as to reasonable doubt. But what real difference is there between an instruction which charges a jury not to convict if there is reasonable doubt of innocence, and one charging that there could be no conviction if there was reasonable doubt of guilt? Reasonable doubt of innocence forbids conviction; reasonable doubt of guilt forbids conviction. The vital question is "guilty or innocent," and so long as there remains a reasonable doubt as to guilt or innocence there can be no conviction.

But if this unusual language alone were misleading, the first charge given for the defendant neutralized its harmfulness, for this charge said: "In reference to the instructions given for the state,

the jury are now charged that any of them devolving on defendant the necessity of explanation is satisfied if the evidence anywhere raises a reasonable doubt of his guilt in their minds." And in the defendant's 7th and 13th instructions the jury is again informed that any reasonable doubt of the defendant's guilt will require an acquittal. In addition, the 4th instruction for the state informs the jury that " if all the evidence in the case furnishes no reasonable explanation of what became of said money, and raises no reasonable doubt of his guilt, he is guilty," etc. Furthermore, the 8th and 11th instructions for the state clearly advised the jury that the defendant was entitled to the benefit of any reasonable doubt of guilt arising out of the evidence.

We are enabled, therefore, to say that the jury was not misled by the peculiar phraseology employed in the state's first instruction.

The first, fourth, sixth, eighth, ninth, and eleventh instructions given for the state are excepted to on the ground that they, and each of them, announce that any shortage shown by the books and failure to pay over of itself make out a *prima facie* case of embezzlement, and that the jury should convict, unless all the evidence raises some reasonable doubt of guilt. It seems to be admitted that the shortage as shown by the books of the treasurer's office and failure to pay over was competent, and that it made out a *prima facie* case, if not disturbed by any other evidence, follows inevitably. That this *prima facie* case of embezzlement, thus made out and undisturbed, would warrant and require a conviction, logically follows also. Indeed, to the legal mind, the statement of the proposition is alone necessary to secure assent to its correctness.

But the exception goes farther and charges that the informing the jury, in these several charges, that it *should* convict was a violation of our law which forbids any court to charge upon the weight of the evidence, and was an invasion of the province of the jury. The contention is that the court was confined to instructing the jury that it *might* convict, and was excluded from instructing that it *must* find defendant guilty. The contention appears to us hypercritical. It is a contention about words. There is no effort to aid the jury in ascertaining the facts, nor a hint as to any opinion

the court entertained upon the evidence, or the weight of the evidence, or upon any particular part of the evidence. There is an open and unmistakable direction to the jury that on a certain proved state of facts, the crime with which the defendant was charged was, in law, made out, and a charge to the jury, that on this proved state of facts, which made out the crime charged, it was their duty to convict. What is the error? Shall an honest and fearless judge engaged in the administration of the criminal law speak only in modulated accents and with bated breath and advise the jury simply that they *may* convict? Never! The judge can only tell the jury that they *may* find the facts as they will, but he is bound by his oath and honor to tell the same jury that they *must* follow him in his legal definitions and conclusions.

The criticism of counsel for defendant upon the state's third instruction is based upon a fatal misconception of its meaning. It is contended by counsel that this instruction required the jury to convict if the defendant's shortage, as shown by the books, was produced by reason of his having paid out money in good faith, upon warrants not lawfully drawn. In other words, it is asserted, that this instruction authorized a conviction even if there was an unwilling error made by the defendant in paying out money upon a warrant not lawfully drawn, though he had no guilty intent and proceeded in good faith, though contrary to law. If the instruction really so charged the jury, it would be obnoxious to the criticism. But the instruction tells the jury that if " Hemingway, as treasurer of the state, wilfully and fraudulently disbursed or otherwise made way with the moneys of the state that came into his hands, save in payment of warrants lawfully drawn on the treasury, or in the payment of bonds and interest and coupons, or in payment of loans made to the state treasury, then he is guilty of embezzlement," etc. It seems to us quite plain that the court only designed to tell the jury that if the defendant wilfully and fraudulently disbursed or otherwise made way with moneys of the state, the offense was complete, unless such money had been paid out on warrants lawfully drawn, etc. That clause of the instruction as to the disbursement of money on warrants lawfully drawn, if mean-

ingless or confusing, cannot be regarded as harmful to the defendant, since, if misleading at all, it was misleading in a direction favorable to the defense.

The fifth instruction for the state gives rise to serious contention and the several grounds of this contention, in connection with like grounds to the state's fourth instruction, not heretofore adverted to by us, we will now proceed to consider.

The fourth instruction charged the jury that if it believed from the evidence that defendant " on final settlement with the state is due the state any sum of money, received by him as treasurer, which he has not disbursed according to law, or paid over to his successor, then it devolves upon him to explain what became of it, and to give a reasonable excuse for such failure to pay over, and if all the evidence in the case furnishes no reasonable explanation of what became of said money, and raises no reasonable doubt of his guilt, he is guilty of embezzlement," etc.; and the fifth instruction for the state told the jury, " that in a prosecution for embezzlement against a state treasurer, the state is not bound to prove any positive acts of concealment in connection with the public moneys intrusted by the people to his safe keeping. It is sufficient if the testimony proves that the defendant has made way with the money, or gotten rid of it, wilfully and fraudulently, in any manner not allowed by law in the disbursement of such funds or upon the state's account," etc.

The contention is that there can be no embezzlement, in legal contemplation, if the entries in the books of account are correctly kept, and no concealment of the fact of any shortage is made, or attempted, by the accused, and there is only the failure to pay over the balance due, as shown by the books, and that this rule was clearly violated in the instructions now under consideration. It must be admitted that the rulings and remarks of English judges in early cases on statutes against embezzlement give countenance to the contention, and that the subject is not free from difficulty, in the light of these English decisions and the authorities which have rather heedlessly followed them. But it is to be noted that the English adjudications are not in harmony with each other, and

that the doctrine contended for by appellant's counsel has more than once been disregarded in cases whose facts forbade adherence to the rule without palpable failure to attain the ends of justice.

The authorities cited in the brief of counsel for appellant demonstrate the perfect accuracy of our remark. In Roscoe's Cr. Ev., p. 473, it is stated, referring to the case of *Rex* v. *Smith,* that " the bare non-application of money in the manner directed is not sufficient whereon to convict a person of embezzlement." But it is added by that author : " For all that appeared in that case, the servant had never appropriated the money at all." And an examination of the case itself of *Rex* v. *Smith,* p. 516, Russ. & Ry. Crown Cases, distinctly discloses that the point decided was that the moneys were received by the prisoner *by virtue of his employment,* and he was therefore guilty, and that the question of the non-application was not considered by the judges in upholding the prisoner's conviction.

The other case relied upon by Roscoe, and cited by appellant's counsel, is that of *Rex* v. *Hodgson,* 14 Eng. Com. Law Reports, 377, as holding that non-application of money in the manner directed, or, in other words, failure to pay over according to legal obligation, is insufficient whereon to convict one of embezzlement. The report is miserably meagre on its statement of the facts. Indeed, it is literally true that there is only the brief syllabus which should precede the report, but the report itself is wanting. The syllabus is in these words, viz. : " It was the duty of the clerk to receive money, daily at N., to enter all such moneys so received in a book, and to remit the amount weekly to L. His entries were all correct, and admitted the receipt of all the moneys ; but he did not remit them to L., as was his duty : *held,* no embezzlement." We are wholly unable to say what weight attaches to the decision of the case, because we are in possession of neither the facts necessary to enable us to comprehend the consideration of the case, nor of the opinion of the court showing by what process it arrived at its conclusion.

But Roscoe, in the same paragraph from which we have quoted, is careful to say : " But, on the other hand, it is clearly settled that

a prisoner, by making an admission in his account that he has received the money, does not necessarily free himself from the charge of embezzlement, if there be other circumstances from which the jury may infer that the money was fraudulently appropriated. Any doubt on this point arises from not keeping clearly in view the distinction between the offense and the evidence of it."

In a later case, *Rex* v. *Grove*, 7 Carrington & Payne, 635, by a divided court, the doctrine insisted upon by counsel is plainly repudiated. In this case, Grove, the prisoner, was a cashier in a London bank, and his duty was to take charge of the cash, and this cash he was required to enter in what was called "the money-book." It was his duty, further, at the close of each day's business, to see that the cash in hand agreed with the "money-book," and strike a balance showing the same in cash which the cashier had in his charge. On a certain day the cash in the money-book, at the close of business, was £1762, which sum the prisoner carried forward properly, and it formed the first item of account in the "money-book" next day. On the latter day, at the close of business, the prisoner, after crediting himself with money paid out by him (for it was his duty to pay out as well as receive money), and after charging himself with the cash received, made the balance on the "money-book" £1309, and this sum of money the prisoner ought to have had on hand. On this same day, the prisoner, being required to settle his accounts and produce said sum of £1309, confessed a shortage of about £900, and an examination showed an actual shortage of £964. On trial it was shown that Oxley, the bank partner, who proved the whole case for the prosecution, had no knowledge when the money, or any part of it had been purloined, from what persons received, what sort of money had been abstracted, or whether it had been taken from the till or upon receipt from customers of the bank. The prisoner was convicted, and, on appeal, it was held that the evidence was sufficient for the jury to find that the prisoner did embezzle the sum named in the indictment.

In a still later case, *Regina* v. *Jones*, 34 Eng. Com. Law, 393, Alderson, B., on trial at the Monmouth assizes, declined to adhere

to *Rex* v. *Grove*, and said : "Whatever differences of opinion there might be in the case of *Rex* v. *Grove*, that proceeded more upon the peculiar facts of that case than upon the law. It is not sufficient to prove at the trial a general deficiency of account."

It will thus appear that there is much confusion on this point in the reported English cases, but we are bound to hold that the rule declared in *Rex* v. *Grove* is the true rule. There can be no other rule in cases involving public officers holding for long terms, and having absolute control and custody of public funds, and whose official actions can be only known to the people by their official reports of the state of their accounts made from time to time. If the failure to pay over the balance shown by his own books, granting the books to be correctly kept, and granting nothing in the officer's conduct worthy of reprehension, so far as any official act discloses such conduct, will not warrant a jury in inferring a conversion of any sum found to be short, then the indictment and prosecution of any state treasurer, or other officer of like character, will not only be a vain and empty form, but it will be, moreover, a shameful and demoralizing play of judicial legerdemain by which even the notoriously guilty shall surely escape just punishment. If the doctrine that a failure to pay over, as required by legal obligation, standing unexplained and unrelieved, will not warrant conviction, then the unfaithful public officer may safely convert the public moneys to his personal use, and either boldly refuse, or blandly fail, to settle and pay over the unexplained balance, and securely defy a plundered people by simply wearing an unruffled countenance, and maintaining a placid demeanor, and keeping correct books, and not publishing to the world that he is steadily emptying the state's treasury vaults. Surely, it cannot be thoroughly believed or successfully maintained that such a transparent travesty of judicial proceeding would not transform the courts of the country into mere theatres for idle mummeries. And yet this is exactly the situation in which we shall finally find ourselves, if it is true that no criminal responsibility attaches to a simple failure to faithfully account for and pay over public moneys by the state's

officers, without reasonable explanation, according to their legal obligation.

In the very nature of things, the fiscal agents of the state, who are employed in the receipt and disbursement of public money through long terms of office can rarely, or never, be convicted of embezzlement, even where they fail or refuse to pay over, though there be an unexplained shortage in the final accounting, except by the evidence of that shortage itself and failure to pay over, and so the plainest requirement of necessity, will drive us, in the administration of the law punishing the crime of embezzlement, to hold that the balance shown to be due by the officer's own books and failure to pay over, unexplained and untouched, must alone warrant a conviction. The rule is not only a necessary one; it is eminently reasonable and just as well.

Can it be regarded as unjust or unreasonable that a public servant shall be tried by the record of his official acts which he himself has made in obedience to legal duty; or that the evidence made by his own official record of his acts shall be held, in the absence of any other proofs, sufficient to make out a *prima facie* case of guilt, and therefore sufficient to authorize and require a jury to convict? We think not.

The correctness of these views is distinctly recognized in the case of the *State* v. *Leonard,* 6 Coldwell, 307, and in the case of the *State* v. *Cameron,* 3 Heiskell, 78, and it would seem to be assented to in the case of the *Commonwealth* v. *Tuckerman,* 10 Gray, 173.

The cases cited by counsel combating this view are, we believe, with a single exception perhaps, clearly distinguishable from the case at bar.

It is further contended that, on this branch of the case, error was committed in the giving of the state's fifth instruction, inasmuch as the jury was thereby told that no "positive acts of concealment in connection with the public moneys entrusted by the people to his (defendant's) safe-keeping" were necessary to be proved.

The contention is not well taken, for the reason that it presupposes the necessity of the existence and proof of positive acts of

concealment of the offense in order to constitute the crime. Concealment, flight, evasion, false entries etc., are but so many circumstances evidencing guilt. They are evidential only, and not essential to the constitution of the crime, and the error of counsel arises out of the failure to bear this distinction in mind. The apparent or real confusion in the authorities, variously cited, has arisen out of the same failure to notice and observe this distinction between the evidence of the crime and the essence of the crime. Evidence of concealment, or evidence of flight, or evidence of absence, or evidence of false entries may be absent, and yet all the essentials constituting the crime may be shown by other proofs.

The ninth instruction for the state is to the effect that the law presumes the auditor and treasurer each complied with the law in making charges and credits on their books, as to receipts and disbursement warrants, and as to furnishing each other with monthly statements of the same, and the law further presumes that their books are correctly kept, and if the incorrectness of the books is relied upon as a defense, then it devolved upon the defendant to show such incorrectness, unless the whole evidence raises a reasonable doubt as to the correctness of the books. Records of matters of a public nature, made and kept in a public office, have always been admissible in evidence on the ground that they have been made by authorized official agents appointed for that purpose, and on the ground of their publicity, and, in addition, because of the presumption arising in favor of the due execution of official acts by those charged with the duty. If there were no presumption of the correctness of official records of acts done in a public office, it would be impossible to introduce the record until the correctness of all its entries had been otherwise shown by extrinsic evidence, and when this had once been done, the introduction of the books would become unnecessary and meaningless. The rule is that, in acts of an official nature, everything is presumed to be rightly performed until the contrary is shown

The official records of the offices named were properly admitted, and the presumption of law was in favor of their correctness. That this presumption may be rebutted is undeniable, but it is equally

undeniable that, until rebutted, the presumption must stand.  Who, then, shall be required to make an alleged incorrectness in the official records manifest?  The person who produces the official record, and rests upon the legal presumption of its correctness, or he who asserts the incorrectness and relies upon that as a defense to rebut the legal presumption?  The question will answer itself, and its answer will meet this contention.

But it is further insisted that this ninth instruction for the state was otherwise erroneous for two reasons : 1. Because by this chaige the court not only informed the jury that the books are evidence of the correctness of the entries therein, and also evidence of the incorrectness of any other evidence, and that the instruction was therefore a charge upon the weight of evidence ; 2. Because the instruction required the defendant virtually to prove his innocence.

By this second proposition we suppose it is meant to be said that the presumption of innocence is affected or destroyed in part by the legal presumption of the correctness of the records, and that this favored presumption of innocence cannot be met by another presumption, but must be destroyed by positive proof.  This contention rests upon the unsubstantial ground that the general presumption of innocence is irrebuttable by any other legal and favored presumption.  The rule is, in case of conflicting legal presumptions, the special and favored must prevail, or take precedence over the general.  And the practical operation of this rule we see constantly exemplified in trials for murder.  In these trials for even capital offenses, we shall constantly find the legal presumption of malice, arising from the use of a deadly weapon, and we shall see this presumption taking precedence over the general presumption of innocence, in the absence of any other evidence showing circumstances of justification or excuse for the homicide.  In this sense, and to this extent, in such cases, by the legal presumption of malice, the accused is put to proof of his innocence outside of and beyond the general presumption of that innocence.  See subsection, 3 Best's Ev. 599 *et seq.*  But, after all, it remains to be said that no proper interpretation of the instruction complained of can support this branch of the contention.  All that was done was to permit the

jury to be informed that there was a legal presumption of the correctness of the official books, and if this was not permissible, then it must be conceded that the presumption of innocence is irrebuttable by any other presumption,—a proposition not to be tolerated in a court of law—for conflicting presumptions must always go to the jury as other conflicting evidence.

The first contention on this point is based upon a misapprehension of the instruction. The court did not declare the presumption of the correctness of the official records conclusive and irrebuttable, but plainly declared such presumed correctness of the records might be met and overcome by proofs made by the defendant, or by all the evidence in the case.

The views we have announced upon the sufficiency of all the counts in the indictment under § 2790, and the opinions which we have propounded on the several legal propositions embodied in the instructions given for the state will render superfluous any consideration of the several identical or similar questions contained in the defendant's refused charges.

The fourteenth instruction for the defendant, which was refused, sought to have the jury informed that while the unexplained books and reports of a public officer, showing a balance against him, are evidence to establish a liability in a civil proceeding, in a criminal case, to make such balance evidence of a receipt of the moneys by defendant, it must appear from the evidence that defendant himself kept the books, or himself directed the entries to be made therein with full knowledge of their character, or with such knowledge made up or signed the reports himself, or with such knowledge directed the entries to be made therein, and that if the jury was not satisfied beyond a reasonable doubt that defendant with such knowledge either made the entries or directed them to be made, then such books were not evidence of the receipt of money.

There was no error of the court in refusing this instruction. The defendant was state treasurer and as such was charged by law with the custody of the public money, and with the keeping of the official records showing his dealings with them. If he did not himself receive and disburse the moneys, and if he did not himself

make the entries in the records of such receipts and disbursements, but employed another to perform his duties in these particulars, the action of that other must be held to be his action, and his criminal liability cannot thereby be evaded, except by showing the incorrectness of the books so kept by such other person. The law confided the great trust to the defendant, and for its execution, whether by himself or another, the defendant must make answer.

The seventeenth refused instruction sought to have the jury informed that unless the evidence showed that defendant had the moneys alleged to have been embezzled in his hands on January 6, 1890, and so having them wilfully defrauded the state by not delivering them to his successor, he could not be convicted under the third count of the indictment.

It is true that the third count states that the defendant then, on January 6th, had the money alleged to have been embezzled in his hands, but this statement was not that of an essential fact necessary to be averred and proved in order to constitute the crime and show defendant's guilt. The offense charged in the third count was a wilful and fraudulent omission of a legal duty on the part of defendant, to wit, the wilful and fraudulent failure of defendant to pay over the ascertained balance, as shown by the records, due from him to the state, to his successor in office. The mere recital of the fact that the money then remained in his hands was not necessary to be proved, because it was not the statement of an essential fact constituting the crime. The crime charged, if proved, was complete whether defendant actually had or had not the money in his hands. The statement of the fact was immaterial, and imposed no duty upon the state to prove it, and, hence, any instruction requiring the jury to consider this immaterial averment and to acquit if it had not been proved, would have been grossly misleading.

The refused instructions for defendant, in reference to the question of reasonable doubt, were immaterial in view of the fact that other and numerous instructions were given in which the law on this point was fully and fairly stated. So, too, the action of the court in refusing the twentieth instruction prayed by defendant could

not have been hurtful, since in other charges the jury had been distinctly advised that the offense must have been committed wilfully.

The twenty-first instruction was properly refused on several grounds, and chiefly because there was not evidence to warrant the giving it.

There was no reversible error in the action of the court in refusing the defendant's twenty-second, twenty-third, twenty-fourth, and twenty-sixth instructions, in which the attention of the jury was particularly directed to the evidence of the defendant's previous good character, the absence of flight, and the correctness of the books in the treasurer's office, and perhaps other circumstances of like character. Nor does the action complained of fall under the condemnation of any principle announced in the case of *Lamar* v. *State*, 64 Miss. 428, and *Gerdine* v. *State*, Ib. 798. The principle is, that when, upon a proved state of facts, the law draws a certain conclusion, then it is the duty of the court to state to the jury the legal conclusion upon the proved facts. But there is no duty upon the court to emphasize certain inconclusive circumstances from which the law raises no presumption. All that could be properly said on such inconclusive circumstances is that they are competent evidence for the jury's consideration, and this is sufficiently done by the admission itself of the circumstances in evidence.

The refusal to give these instructions is clearly within the rule of practice announced in *Cheatham* v. *State*, 67 Miss. 335. In that case the action of the court below in giving an instruction that the jury might consider any threats against deceased, proved to have been made by the accused, and any motive to kill established by the evidence, together with all the evidence, was assigned for error. Said Judge Cooper, in delivering the opinion of the court: The instruction does not "announce any erroneous proposition of law. On the contrary, by admitting such evidence, the court declared its competency, and it is true that the jury may and should consider all the evidence in forming its verdict. While we do not think the instruction erroneous in the sense of entitling the accused to a new trial, it is much to be hoped that the courts will reject such charges when asked. Counsel representing the state may very

properly argue before the jury the effect of such evidence. But the field of argument is so nearly invaded by such instructions that the court may with propriety decline to give them."

The views hereinbefore announced, either on the pleading or upon the instructions, both for the state and the defendant, are thought to settle the correctness of the court's action on the refused instructions not specifically reviewed by us. The legal principles applicable to the case were fully and fairly given to the jury in our opinion.

4. The fourth assignment of error goes to the action of the trial court in refusing to compel the state's counsel to elect under which count of the indictment he would proceed.

The motion is not one of right, but is addressed to the sound discretion of the court, and we should not reverse the action complained of, unless manifestly erroneous. But the conclusive answer to this contention is, that the motion to compel the state to elect was not made until after defendant had pleaded to the entire indictment, and until after the trial had actually progressed to that stage where the state had introduced its evidence and had rested. The motion was then too late, as has been repeatedly held in this court. *George* v. *State*, 39 Miss. 570, and cases there cited.

5. The fifth assignment of error brings under review the action of the court below in refusing to set aside the verdict and grant a new trial. The grounds upon which the motion rested have been already examined by us, except those predicated upon the alleged misconduct of the district-attorney in his concluding argument, and upon the verdict of the jury itself.

On the first ground, viz., the alleged impropriety of the behavior of the state's counsel in his concluding argument, we have to say, briefly, that while recognizing the privilege of counsel to the exercise of the largest liberty in argument, and while admitting pardonable liability of the earnest advocate to transgress the bounds of permitted license, still, in this case, or in any case, if it seemed probable to us, on a full survey of the whole case, that the unwarranted remarks of counsel had swerved the jury from the right line, or had contributed to secure a verdict not clearly responsive to the

evidence and the instructions of the court, we should feel it our duty to reverse.  In all cases not clear upon the facts, the improper course of counsel which might have assisted the jury in reaching a given conclusion, independently of the evidence, would authorize a reversal.  But where the sweep of an irresistible tide of evidence would, despite all immaterial errors of court, or reprehensible lapses from propriety of counsel, bear an enlightened mind and conscience to a fixed conclusion of guilt, the appellate court may not properly reverse.

Some things said by the state's counsel should not have been said, and other things would have been better left unsaid, we are free to confess; but we have looked in vain for those gross professional obliquities in the conduct of the district-attorney's argument, and which are supposed by appellant's counsel to have swept the jury from its feet and secured a verdict not supported by the evidence.

6. As to the only remaining contention that the evidence was not sufficient to support the verdict, it is our plain and imperative duty to say that the shortage in the defendant's accounting with the state, or its treasurer, is put beyond the reach of cavil by the evidence in the record before us.  The official records required by law to be kept by the treasurer bear silent witness against the defendant, and this silent witness is powerfully supported by a vast mass of other and independent and convincing evidence pouring in the same direction.

If this deficiency of more than $300,000 has arisen because of errors in the defendant's receipting his predecessor in office fourteen years ago, how is it possible to conceive the failure to discover such errors prior to 1886, when, on the basis of that settlement with Holland, the former treasurer, the defendant was only chargeable with a balance of about $7000?  Does not human credulity stagger when asked to believe that the defendant was, in 1886, actually carrying the state as his debtor for more than $300,000? And yet this must be conceded, if it was true that this balance of $315,000, alleged to have been embezzled, was created by an error

of like amount against the defendant, growing out of the settlement with Holland.

If this great balance is the product of error in book-keeping since 1886, when the accounting disclosed only about $7000 in the defendant's hands, is it not equally incredible that all the official and unofficial, public and private, examinations of the records in the treasurer's office have signally failed to discover that tremendous fact?

That the defendant has not accounted for or at all explained his failure to produce or pay over the great balance shown to have been in his hands, or to have been converted or made way with by him, is incontrovertibly made certain, and all the evidence in the case leaves us no solid ground upon which to rear any other conclusion than that arrived at by the jury on the trial below.

*Affirmed.*